876 F.2d 109
 277 U.S.App.D.C. 350, 19 Envtl. L. Rep. 20,883
 PLATTE RIVER WHOOPING CRANE CRITICAL HABITAT MAINTENANCE
TRUST, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
The Central Nebraska Public Power and Irrigation District, Intervenor.
 No. 88-1425.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 21, 1989.
Decided May 19, 1989.
 
 Abbe David Lowell, with whom Peter J. Kirsch, Washington, D.C., was on the brief, for petitioner.
 Hanford O'Hara, Atty., F.E.R.C., with whom Catherine C. Cook, General Counsel, and Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.
 Nancy S. Bryson, Washington, D.C., was on the brief, for intervenor.
 Tom Watson, Washington, D.C., also entered an appearance, for intervenor.
 Before WALD, Chief Judge, and EDWARDS and SILBERMAN, Circuit Judges.
 Opinion for the Court filed by Chief Judge WALD.
 WALD, Chief Judge:
 
 
 1
 The banks of the Platte River in central Nebraska are home to a number of endangered species of wildlife, including the whooping crane. Petitioner Platte River Whooping Crane Critical Habitat Maintenance Trust ("Trust") was established in 1978 by the Basin Electric Power Cooperative, Inc. as part of a settlement of litigation over the construction of a Wyoming dam; it is administered by three trustees representing the State of Nebraska, the National Wildlife Federation and Basin Electric. Its mandate is to "protect and maintain ... the physical, hydrological and biological integrity of [the Platte River] area so that it may continue to function as a life-support system for the whooping crane and other migratory species which utilize it." Because of this mandate the Trust has a keen interest in intervenor-respondents', the Central Nebraska Public Power and Irrigation District and the Nebraska Public Power District ("Districts"), operation of two large hydroelectric projects on the Platte River which may critically affect the continued vitality of wildlife in the area. The Trust is currently before this court seeking review of an order of the Federal Energy Regulatory Commission ("FERC" or "Commission"), refusing the Trust's request that FERC undertake an assessment of the need for wildlife protective conditions in the interim annual licenses pursuant to which the Districts are currently operating pending the completion of relicensing proceedings before FERC. We find that refusal of this request was an abuse of discretion and remand the case back to FERC to conduct such an assessment.
 
 I. PROCEDURAL HISTORY
 
 2
 The Districts were initially licensed to operate hydro-electric Project No. 1835 and Project No. 1417 in 1941 by FERC's predecessor, the Federal Power Commission. These long-term licenses expired on June 30 and July 29, 1987, respectively.
 
 
 3
 FERC regulations require the Districts to file applications for relicensing no later than three years prior to the expiration of old licenses. 18 C.F.R. Sec. 16.3(a) (1986). Applications for a new license must include extensive information about the operation of a project, including reports on water quality and on fish, wildlife and botanical resources. 18 C.F.R. Sec. 4.51 (1986). FERC may find an application deficient for failing to provide required information and grant an applicant an additional ninety days in which to perfect the application. 18 C.F.R. Sec. 4.32(d)(1)(i) (1986). "If the revised application is found not to conform to the requirements [of the regulations] or if the revisions are not timely submitted, the revised application will be rejected." 18 C.F.R. Sec. 4.32(d)(1)(iii) (1986). In the event that no new license has been issued prior to the expiration of existing licenses, FERC is required to issue from year to year an annual license "to the then licensee under the terms and conditions of the original license until ... a new license is issued." 16 U.S.C. Sec. 808(a) (1985).
 
 
 4
 The Districts submitted applications for new licenses on June 28, 1984, two days before the statutory deadline. On December 7, 1984, FERC informed the Districts that their applications were deficient. FERC's deficiency letter stated that the applications' Report on Water Use and Quality had to be revised to include
 
 
 5
 A description ... of the minimum flow recommendation made by the agencies consulted to include an explanation of why the Applicant has rejected any flows recommended by an agency
 
 
 6
 and the Report on Fish, Wildlife and Botanical Resources had to be revised to include
 
 
 7
 An analysis ... of the long-term impact on the vegetation and wildlife of the North Platte and Platte River systems resulting from the past operations of the existing systems [and] a discussion of feasible operating alternatives and mitigative measures that would minimize the continuing impact so [sic, probably should be "of"] the projects and enhance existing botanical and wildlife resources. The response should include a detailed discussion of the project's impact on the whooping crane's designated critical habitat and alternatives for protecting and enhancing the critical habitat.
 
 
 8
 Brief for Intervenor-Respondents, Addendum B at B-21.
 
 
 9
 The Districts responded to the deficiency letter by asking that they be permitted to delay correction of the deficiencies until completion of a joint Fish and Wildlife Service and Bureau of Reclamation Study ("Joint Study"), designed to provide resource management information relevant to the issues raised by the deficiency letter. On January 27, 1986 (over a year and a half after the applications had been filed), FERC informed the Districts that the applications were still deficient but that they would be granted an extension of time until 120 days after the completion of the Joint Study to correct the deficiencies. At this time, the Trust was not a party to the proceedings: since there had been no notice of a renewal application published in the Federal Register, 18 C.F.R. Sec. 385.2009 (1986), no date for filing interventions had been established. 18 C.F.R. Sec. 385.210 (1986). Thus, no petition for rehearing of the grant of this extension of time was filed by the Trust.
 
 
 10
 Another fifteen months passed, without completion of the Joint Study and therefore with no completed application for new licenses filed with FERC. With the existing licenses due to expire and no prospect that new licenses would be issued before expiration,, the Trust noticed its intention to intervene and on May 22, 1987, filed a petition asking that FERC consider the need for environmental protective conditions in the annual licenses that it would be required to issue as of June 30 and July 28, 1987.
 
 
 11
 The Commission's first response to this request asserted that FERC had no authority to condition the annual licenses and that therefore there was no point in undertaking any review of the need for such conditions. FERC denied the petition to amend the annual licenses on June 30, 1987, stating:
 
 
 12
 [T]he Commission is empowered to amend an annual license, for example by adding conditions for the protection of fish and wildlife, only if the existing license contains such reservation of authority or the licensee agrees to such additional conditions. The existing licenses ... contain no such reservations of authority.
 
 
 13
 Central Nebraska Public Power and Irrigation District, Project No. 1417, 39 F.E.R.C. p 61,378 at 62,223 (1987).
 
 
 14
 On July 24, 1987, the Trust petitioned for rehearing of the denial, pointing out that the license for Project No. 1835 did in fact include an express reservation of FERC's authority to alter the license at its discretion and that licenses for both projects provided for modification with the consent of the licensees. FERC granted the petition for rehearing for the purpose of reconsideration. Another nine months passed, still without completion of the Joint Study and correction of the deficiencies in the Districts' original applications for new licenses. Then, on May 5, 1988, the Commission issued its order denying rehearing of the Trust's request for an assessment of the need for environmental protective conditions in the annual licenses.
 
 
 15
 While conceding that the license for Project No. 1835 reserved modification authority to the Commission, FERC refused to either exercise this authority or to seek the cooperation of the Districts in arriving at consensual amendments to the annual licenses for both projects. FERC rested this decision on the ground that "Commission orders [must] be based on substantial evidence [and] we do not have sufficient information to determine appropriate mitigative conditions." Central Nebraska Public Power and Irrigation District, Project No. 1417, 43 F.E.R.C. p 61,225 at 61,579 (1988). FERC noted that the information necessary to formulate conditions was being gathered in connection with relicensing.
 
 
 16
 In this same order, FERC also acknowledged the unexpectedly slow pace of the Districts' efforts to cure the deficiencies in their applications and the consequent delay in the commencement of the relicensing proceeding. The Commission found that the Joint Study was
 
 
 17
 not progressing at the expected rate, the projected date for completion is unclear and the information expected to be included in the Study will not be as helpful to the licensees as once hoped. It is therefore no longer appropriate to tie the correction of the deficiencies in the relicense applications to the completion of the Joint Study.
 
 
 18
 43 F.E.R.C. at 61,580. Granting a petition filed by other public interest groups (but not the Trust), requesting that expeditious procedures for relicensing be established, FERC set a new deadline for correction of the deficiencies in the Districts' applications, giving them two more years to gather the necessary information. The Districts now have until May 5, 1990 to complete their applications: relicensing proceedings will not begin until that date; annual licenses will continue to issue until the completion of those proceedings. No petition for rehearing of this scheduling order was filed by the Trust.
 
 II. ISSUES ON APPEAL
 A. Jurisdiction
 
 19
 Our consideration of the Trust's petition for review of FERC's action in this case has been hampered at the outset by the Trust's apparent misapprehension of the jurisdictional requirements of the Federal Power Act ("FPA"). As we have repeatedly emphasized, the requirements imposed by the statute are strict and go well beyond judicially-imposed standards requiring the exhaustion of administrative remedies prior to the exercise of federal court jurisdiction. ASARCO, Inc. v. FERC, 777 F.2d 764, 774 (D.C.Cir.1985); see also Tennessee Gas Pipeline v. FERC, 871 F.2d 1099, 1109-110 (D.C.Cir.1989).[1] Parties seeking review of FERC orders must petition for rehearing of those orders and must themselves raise in that petition all of the objections urged on appeal. 16 U.S.C. Sec. 825l (b) (1985); ASARCO, 777 F.2d at 773. Neither FERC nor this court has authority to waive these statutory requirements. Tennessee, 871 F.2d at 1107; Boston Gas Co. v. FERC, 575 F.2d 975 (1st Cir.1978).
 
 
 20
 The Trust does indeed raise on appeal the primary request put to the agency in its petition for rehearing, i.e., that FERC assess the need for protective environmental conditions in the annual licenses issued pending relicensing. But the Trust has structured arguments to the court around two additional issues as well: the delay surrounding the relicensing proceeding and FERC's failure to consult with the Fish and Wildlife Service before issuing the annual licenses.[2] Because neither of these two issues was a focus of the Trust's agency petition, nor the subject of specific relief requested from FERC, we doubt our jurisdiction to review these issues in their own right. Fortunately, we are able to dispose of the appeal without doing so.
 
 
 21
 We limit our review to the primary issue argued to the agency, that is, the question of whether FERC abused its discretion in refusing to undertake any inquiry into the need for environmental protective conditions in the Districts' annual licenses. While we are disturbed by the protracted delay surrounding the relicensing proceeding, the fact that FERC's latest order requires relicensing to proceed within one year renders our declination to reach the delay issue less worrisome.[3] At this juncture we would not likely second-guess FERC's judgment that an additional year is needed to collect the necessary information to complete the final relicensing applications. We are confident that FERC will in fact proceed expeditiously in 1990 with the long-postponed relicensing proceeding.
 
 
 22
 Neither do we address the issue of whether FERC was required under the Endangered Species Act to consult on environmental concerns with the Fish and Wildlife Service ("FWS"). No specific request for consultation was made by the Trust,[4] and to the extent the requirements of the Endangered Species Act were raised before the Commission, they were raised in connection with the Trust's more general request that FERC undertake review of the need for protective conditions in the annual licenses. It is to this issue that we now turn.
 
 B. Annual License Conditions
 
 23
 FERC's first argument is that since the issuance of annual licenses is a ministerial, nondiscretionary act required by statute, the Commission was not obligated to undertake any review of the environmental impact of the projects' operation under annual licenses. But as the Commission itself recognized in its order denying rehearing, at least one of the existing licenses contained an express reservation of authority for FERC to impose conditions, including environmental protective conditions. And as we understand the Trust's (uncontested) representation in its petition for rehearing before FERC, both licenses contain provisions allowing the introduction of new conditions with the consent of the licensee. Thus, while the issuance of the annual licenses themselves is indeed a nondiscretionary act, in that the Commission has no choice but to issue the licenses to the existing licensees, 16 U.S.C. Sec. 808(a) (1985); see Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. FPC, 510 F.2d 198, 203-10 (D.C.Cir.1975), the Commission does have authority to formulate conditions for both licenses, to seek the cooperation of the Districts in adding the conditions to the licenses, and, in the case of one, to impose conditions unilaterally at any time.
 
 
 24
 FERC's second argument is that it lacked sufficient information to exercise this residual authority. FERC correctly stated the standard of review: Commission orders must be supported by substantial evidence. 16 U.S.C. Sec. 825l (b) (1985). FERC erred, however, as to what this standard required in this case. It is certainly true that FERC could not impose conditions on one license or propose conditions for the other in the absence of substantial evidence to indicate that the conditions satisfied the objectives of the FPA. But, although the Trust called its petition a "Petition to Amend Licenses," the substance of its immediate request was not for the imposition of specific proposed conditions but for the commencement of procedures to review the need for any such conditions. It is the refusal, in the circumstances of this case, discussed below, to engage in any such review, not the refusal to impose specific conditions, which must be supported by substantial evidence or, more accurately here, found not to be an arbitrary or capricious exercise of discretion.[5]
 
 
 25
 We cannot find such support for FERC's refusal to review the need for conditions in the annual licenses. As an opener, it is no answer to suggest, as the Commission appeared to do, see 43 F.E.R.C. at 61,579, that the agency has no duty to collect information unless it already has adequate information at hand to show the need for conditions. It was precisely because more information was needed that the Trust urged FERC to collect further information from the related public and private bodies. Admittedly, a bareboned request to collect information about the need for protective conditions could be summarily dismissed, but here there was considerable evidence laid before the Commission to trigger its attention to the problem. Moreover, the Trust itself represented in its petition that it would, if given the opportunity, present "evidence from five years of studies on the Platte River on the effects of operations of the projects on downstream migratory bird habitats." Joint Appendix ("J.A.") 23.
 
 
 26
 The Commission also based its refusal on the ground that the necessary information would be developed and addressed during the relicensing proceeding. This rationale, however, is also flawed. At the time of the Trust's initial petition in 1987, the Districts had apparently made little progress in the Joint Study and consequently the start of the relicensing proceeding was still a long way off. And when FERC ultimately denied the Trust's petition for rehearing, the relicensing proceeding was not scheduled to commence for another two years. Thus FERC was at all times aware that it would probably take several years before the environmental issues surrounding the continued operation of the Platte River projects would be resolved in a relicensing proceeding.[6]
 
 
 27
 FERC was also well aware of the existence of serious environmental threats from the projects. First, Congress in 1986 had noted that
 
 
 28
 [t]he area in question also provides habitat for several endangered species, namely the Whooping Crane, the Bald Eagle and the Least Tern.... [T]he protection of these species reportedly could require measures to protect, mitigate damage to and enhance the habitat. Such measures may include changes in minimum flows without creating an irrigation shortage and could be required under existing law[.]
 
 
 29
 Conference Report at 24; see n. 6 supra.
 
 
 30
 Second, the Commission itself had addressed the impact of the Platte River projects on wildlife in the past. As early as 1975 a biological assessment prepared by the Commission found that the "fate of the [whooping crane] critical habitat lies in the dynamics of the Platte River System," and emphasized the projects' impact on flow levels in the river and the ecological balance on which endangered species such as the whooping crane depend. See J.A. 28 (1987 letter from FWS summarizing the 1975 assessment). Later, in 1980 when the Districts sought to amend their licenses and undertake further development of their hydroelectric projects, the National Wildlife Federation intervened in the amendment proceedings and
 
 
 31
 raised questions concerning the effect of the proposed modifications and the current operation of the two projects on the area of the Platte River (downstream of the two projects) which the Department of Interior has found to be a critical habitat ("designated critical habitat") of the Whooping Crane (Grus Americana) and the effect of the proposed modifications and current operation on other species.
 
 
 32
 Nebraska Public Power District, Project No. 1417, 13 F.E.R.C. p 61,122 at 61,253 (1980). In response to these concerns, the Commission ultimately approved a settlement between the National Wildlife Federation and the Districts in which the Districts agreed to "prepare a protocol of experimentation with respect to the daily release schedule from Kingsley Project No. 1417 into the upstream portion of the designated critical habitat in order to acquire additional knowledge of the ecological system." Id.[7]
 
 
 33
 The Department of the Interior ("Interior") and the Environmental Protection Agency ("EPA") also highlighted the environmental impact of the projects in connection with the 1980 license amendment proceeding.
 
 
 34
 Interior expressed concern that the proposed project may affect two endangered species, the Bald Eagle and the Whooping Crane, and requested that the FERC initiate a consultation procedure, as required by Section 7 of the Endangered Species Act, as amended. EPA also commented that the primary and secondary effects of the proposed project on maintenance of the Whooping Crane habitat were not adequately discussed in the application.... Interior stated further that since existing project facilities are major flow controlling factors throughout the critical habitat area of the Platte River, their operation has a significant effect on the conservation of the Whooping Crane and its critical habitat.
 
 
 35
 Central Nebraska Public Power and Irrigation District, Project No. 1417, 14 F.E.R.C. p 62,009 at 63,016 (1981). As noted in FERC's original order in the instant proceeding, 39 F.E.R.C. at 62,223, the Commission responded to Interior's request for consultation by preparing a biological assessment of the impact of the proposed 1980 modification of the projects.
 
 
 36
 In preparing the biological assessment, [FERC] staff conducted an independent analysis to determine if the hydroelectric development, as proposed, would cause any changes in the Platte River flows thereby jeopardizing the critical habitat area and its value to the endangered Whooping Crane during migration. Staff concluded that the existing licensed projects in combination with other water developments along the Platte River have contributed to the cumulative flow depletion accruing within the river system. However, considering the operation of the project, as amended, the flow regime of the North Platte River would not be changed; therefore a determination was made that the proposed action would not add further to the alteration or modification of the critical habitat area or endanger the continued existence of the Whooping Crane. As noted by Interior, the existing project facilities are major flow controlling factors throughout the critical habitat area, and operation of such facilities have contributed to the modification of the designated critical habitat area and its value to the Whooping Crane.
 
 
 37
 Id. at 63,016-17 (emphasis added). It is clear from this excerpt that, while concluding that the 1980 modifications would not contribute to further degradation of the critical habitat, FERC nonetheless recognized that the existing projects posed a potential threat to wildlife. Moreover, Interior concurred in this biological assessment and FERC adopted Interior's recommendation "that the order amending the licenses require the Licensee[s] comply with procedures that have been agreed upon in consultation with Interior to ensure that the project operates in a manner which would aid in conserving the Whooping Crane and its critical habitat." Id.[8]
 
 
 38
 Thus for almost a decade FERC had been apprised of the possibility of potential harm to the whooping crane flowing from the operation of the projects pending relicensing, absent some form of interim license conditions designed to mitigate such harms. FERC was also cognizant that an assessment of the need for protective conditions had already been delayed several years and was about to be delayed several more by the drawn-out relicensing process. This knowledge should have caused FERC, prompted by the Trust's application and attendant offer to make available its own studies on the subject, to at least explore the need for protective conditions in the annual licenses.
 
 
 39
 We do not think it a sufficient answer for FERC to promise to address the issue on relicensing. The importance of assessing the need for interim protection--not necessarily resolving the ultimate environmental/power issues but considering temporary, "rough and ready" measures to prevent irreversible environmental damage pending relicensing--was further emphasized to the Commission when, in connection with the issuance of the annual licenses, Interior requested that FERC enter into formal consultation with FWS:Formal Section 7 consultation is necessary because the Fish and Wildlife Service (Service) believes that issuance of annual licenses for Projects 1835 and 1417 will affect several Federally listed endangered and threatened species and designated critical habitat in the area affected by the projects. These species include the endangered whooping crane, interior least tern, bald eagle, and the threatened piping plover. The Platte River Valley ... is designated critical habitat for the whooping crane. Issuance of annual licenses for Projects 1835 and 1417 will affect these species and their habitats because all four species require Platte River habitats during specific critical intervals of their life cycles. Furthermore, the suitability and availability of Platte River habitats of these listed species have been directly and indirectly influenced by the instream flows that are regulated by Projects 1835 and 1417 since the inception of the projects and will continue to be influenced by the projects during the duration of the annual license and relicense. [FWS then recited the findings of the 1975 biological assessment.] Consequently, we reiterate the need for you to initiate consultation on the issuance of annual licenses for Projects 1835 and 1417.
 
 
 40
 J.A. 27-28 (emphasis added). Thus the expert agency primarily responsible for administering the Endangered Species Act[9] expressed its view directly to FERC that continued operation of the projects under the annual licenses, pending relicensing, posed a potential threat to endangered species such as the whooping crane. We conclude that it was irresponsible for FERC to ignore this expert opinion and refuse even to conduct a preliminary investigation into this threat and the availability of interim measures to combat it. Because of FERC's refusal to take even a cursory look at the potential damage flowing from operation of the projects pending a long-delayed relicensing process, we cannot of course even begin to assess the legitimacy of FERC's decision not to exercise its authority to seek the cooperation of the Districts in preventing irreversible harm to critical habitats or to impose interim protective conditions upon one of them.
 
 
 41
 We are reinforced in our conclusion that FERC's refusal to preliminarily assess environmental issues amounted to an abuse of discretion by Congress' explicit endorsement of the view that the Commission should consider environmental issues when granting annual licenses. Congress amended the FPA in 1986, enacting the Electric Consumers Protection Act, Pub.L. No. 99-495, 100 Stat. 1243 (1986) ("ECPA"). One of the key objectives of the ECPA was to remedy FERC's "less than satisfactory" history of according environmental factors less weight than power production concerns in licensing. See H.R.Rep. No. 99-507, 99th Cong., 2d Sess. 17 (1986), U.S.Code Cong. & Admin.News 1986, pp. 2496, 2503 ("House Report").
 
 
 42
 The conferees believe that as a Nation we have come a considerable distance in recognizing the importance of our heritage. This legislation extends that "distance" a bit more. The amendments expressly identify fish and wildlife protection, mitigation and enhancement, recreational opportunities and energy conservation as nondevelopmental values that must be adequately considered by FERC when it decides whether and under what condition to issue a hydro-electric license for a project. We agree that there are instances in which careful and thoughtful consideration of the impact of a proposed project would and should lead to the conclusion that an original license ought not to be issued. [But see Conference Report at 24 (conferees believe ECPA environmental balancing should not be very detrimental to Platte River projects).]
 
 
 43
 Amended section 4(e) requires FERC, in deciding whether to issue an original license, in the case of a new project, or to issue a new license for an existing project, the [sic, probably should be "to"] give "equal consideration" to the purposes of energy conservation and environmental values, including fish and wildlife and recreation, in deciding whether to issue the license for power and developmental purposes. Such consideration is important because it is intended that FERC give these nondevelopmental values the same level of reflection as it does to power and other developmental objectives. In other words, it requires the thorough evaluation of these values before FERC makes its licensing decision. Consequently, equal consideration must be viewed as a standard, both procedural and substantive, that cannot be satisfied by mere consultation or by deferring consideration and imposition of environmental conditions until after licensing. Protection, mitigation and enhancement of fish and wildlife, energy conservation, and the protection of recreational opportunities are a potential cost of doing business for hydropower projects.
 
 
 44
 Conference Report at 21-22, U.S.Code Cong. & Admin.News 1986, p. 2538. Thus Congress clearly expressed its intent that environmental concerns be moved higher up on FERC's agenda in licensing decisions.
 
 
 45
 While the amendments requiring environmental factors to be given added weight themselves do not come into play until the ultimate relicensing proceeding, Congress also expressed its view that consideration of the need for environmental conditions should enter into the annual licensing process. First, the House Report on the ECPA addressed the Commission's authority to amend existing licenses in order to introduce environmental conditions:
 
 
 46
 The Committee is aware of the concern over the Commission's authority to address license conditions and terms after licenses have been issued. In this Committee's view, this concern is based on possibilities, rather than actual history. The Committee believes that the Commission should have authority to ensure that licenses reflect current information concerning the need to protect fish and wildlife.
 
 
 47
 House Report at 32, U.S.Code Cong. & Admin.News 1986, p. 2519 (emphasis added). While the ECPA "does not change existing law, including case law, governing FERC authority to modify licenses during their term," id., we believe that it clearly indicates that Congress expected FERC to exercise whatever authority it might have to introduce into existing licenses environmental protective conditions that in its judgment appear necessary.
 
 
 48
 Second, Congress explicitly addressed the issue of amending annual licenses, approving a view propounded by the Ninth Circuit in 1984. In Confederated Tribes and Bands of the Yakima Indian Nation v. FERC, 746 F.2d 466 (9th Cir.1984), FERC argued that its then-policy of delaying consideration of environmental issues until after a new license had issued was preferable to the alternative of addressing environmental issues in an extended relicensing proceeding and issuing unconditioned annual licenses in the interim. The Ninth Circuit rejected this rationale by observing that annual licenses which contain reopener clauses can in fact be amended to adopt interim protective conditions pending relicensing. Congress relied on this observation in Yakima to highlight the fact that FERC can and presumably should promote the environmental objectives of the ECPA by amending annual licenses to include protective conditions:
 
 
 49
 The Committee also retained the authority for FERC to issue annual licenses to an existing licensee pending a resolution of the relicensing proceeding. However, the Committee expects FERC to use this authority in a manner that does not encourage or allow delay in the licensing proceeding. The Committee also notes that the Court in the Yakima litigation pointed out that such annual licenses can include fish and wildlife provisions. The Court said:We also find unpersuasive FERC's argument that the procedure it used offers more protection for the fishery than simply issuing annual licenses. This argument is based on FERC's incorporation of the Mid-Columbia settlement agreement's minimum stream flow conditions into the new Rock Island license. The same protections could have been added to an annual license. An annual license must contain the same terms as the expired license, [ ], but the Rock Island license, as amended in 1974, contained a 'reasonable modifications' clause in Article 21. The Mid-Columbia Proceeding interim settlement agreement could have been incorporated through that clause.
 
 
 50
 Id. at 33, U.S.Code Cong. & Admin.News 1986, p. 2520 (emphasis added).
 
 
 51
 This legislative history bolsters our view that it was not reasonable for FERC, in light of the many years of governmental and private concern over the projects' effects on wildlife habitats, to refuse to even explore or consider the need for some interim environmental protections pending the completion of the relicensing proceeding. As we have already emphasized, FERC had been generally aware of the potential need for such protections since 1975, FWS had specifically brought to FERC's attention the need for such protections in the annual licenses, and FERC's own handling of the schedule for relicensing made plain the likelihood that relicensing would not be accomplished for several years to come. While the Commission is certainly free to decide, based on substantial evidence, that new license conditions are not called for, we conclude that the Commission's failure to undertake any form of assessment of environmental issues in connection with its issuance of the annual licenses was, under the peculiar history of this dispute, an abuse of discretion. Accordingly, we remand the case to FERC for further proceedings consistent with this opinion.
 
 
 52
 So Ordered.
 
 
 
 [1]
 The jurisdictional requirements of the Federal Power Act and the Natural Gas Act are identical
 
 
 [2]
 The Trust asserts that the issuance of the annual licenses constitutes an agency action triggering the consultation requirement of the Endangered Species Act. 16 U.S.C. Sec. 1536(a) (1985). See n. 9, infra
 
 
 [3]
 Our doubts about jurisdiction also counsel against deciding this issue. The Trust did bring its objection about delay to the attention of FERC in the course of arguing its position on why it was necessary to assess the need for environmental protective conditions in the annual licenses. As we noted supra, however, the Trust did not petition for rehearing of the initial grant of an extension of time allowing the Districts 120 days after the completion of the Joint Study to cure the deficiencies in their applications; nor did the Trust itself petition for rehearing of the timetable establishing a new deadline for completing the applications of May 1990
 
 
 [4]
 We intimate no view as to whether the Trust would have standing to request that FERC consult FWS under the Endangered Species Act nor whether that Act required such consultation in this case
 
 
 [5]
 The FPA substantial evidence test "is no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings." Maryland People's Counsel v. FERC, 761 F.2d 768, 774 (D.C.Cir.1985)
 
 
 [6]
 The issues raised by this relicensing include ones that are particularly difficult, and therefore time consuming, to resolve. When Congress amended the FPA in 1986 and made explicit the obligation on the Commission to give environmental considerations equal weight to that accorded power and irrigation concerns, see infra at 117-18, it devoted a full two pages in the Conference Report on the amendments to discussing their impact on these two Platte River projects. Congress identified these projects as posing hard questions under the Act's new approach to determining the public interest with respect to hydroelectric licensing. See H.R.Rep. No. 99-934, 99th Cong., 2d Sess. 24-25 (1986) ("Conference Report"). ("The conferees expect, without knowing or deciding what the appropriate resolution will be for these projects, that the process and requirements of this Act will result in a resolution of these potentially competing values so that fish and wildlife and the projects' developmental purposes will be compatible, in the context of the public interest.")
 
 
 [7]
 The Districts also agreed that "if new licenses are ... issued to [the Districts] prior to expiration of the original licenses, [the Districts] will implement, under the original licenses any changes in operation designed to inure to the benefit of the Whooping Crane." Id. FERC explained further that the Districts "will either implement directly or not oppose any order implementing these requirements under the original license" and the National Wildlife Federation agreed not to support in a relicensing proceeding "the imposition of conditions which would reduce the hydroelectric generation output at [one of the projects] unless the Commission finds a significant effect on the designated critical habitat." Id. at n. 3, n. 4
 
 
 [8]
 In a subsequent order, the Commission modified the license condition which read, "Licensee shall comply with procedures agreed upon in consultation with Interior, as described in the Order Approving Settlement issued November 13, 1980 [the settlement with National Wildlife Federation discussed supra], to ensure that the project operates in a manner which would aid in conserving the Whooping Crane and its critical habitat," by deleting the final clause, "to ensure...." Central Nebraska Public Power and Irrigation District, Project No. 1417, 14 F.E.R.C. p 62,226 (1981). Presumably this amendment was designed to clarify that the Districts were obliged only to comply with the procedures set out in the 1980 settlement (requiring flow studies), not to ensure that the operation of the projects posed no threat to the whooping crane critical habitat
 
 
 [9]
 The Endangered Species Act requires that "Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical." 16 U.S.C. Sec. 1536(a)(2) (1985)